Jimmie **DEAN**, Plaintiff,

v.

THE **BOEING COMPANY** and International Association of Machinists and Aerospace Workers, AFL–CIO, District Lodge # 70, Defendants.

No. 00–1256–JTM.

United States District Court, D. Kansas.

March 29, 2002.

---

Mark G. Ayesh, Ayesh Law Offices, Wichita, KS, for plaintiff.

Trisha A. Thelen, Forrest T. Rhodes, Jr., Foulston & Siefkin L.L.P., Wichita, KS, for Boeing Co., defendant.

Thomas E. Hammond, Hammond, Zongker & Farris, L.L.C., Wichita, KS, for District Lodge No. 70, defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

In the present case, plaintiff Jimmie Dean advances claims of wrongful retaliation under Title VII and the Kansas Act Against Discrimination (KAAD) and breach of contract against his employer, The Boeing Company. Among other things, Dean alleges that Boeing retaliated against him for the participation of his wife in a separate lawsuit against the company when it suspended him for three days for sexually harassing another Boeing worker. Boeing has moved for summary judgment. For the reasons stated here, defendant's motion will be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely

upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e))(emphasis in *Matsushita* ). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact [1]

Dean is an hourly employee. He has worked for Boeing since April 3, 1997. At the time relevant to this lawsuit, Dean worked second shift in the Material organization. The terms and conditions of his employment are governed by a Collective Bargaining Agreement.

Other than a three-day suspension Dean received for harassing a co-worker, he has not missed any work as a result of the allegations contained in his complaint and he continues to work at Boeing.

Dean's wife, Mary Dean, is also an hourly worker in the Material organization at Boeing. She generally works first shift, although she was temporarily assigned to second shift for two periods in 1999: from January 25 to February 5, and from February 15 to February 19. These assignments were made pursuant to Mary Dean's request to reduce the number of contacts she would receive during the *Williams* lawsuit, as discussed further below. .

During 1999 and 2000, Vernell Jackson served as the director over the Material organization, and had served in that capacity since 1996. The Material organization includes approximately 400 hourly and salaried employees. Jackson had four second-level managers who reported directly to him during this time period, including Ricky Lee, who served as a second-level manager over both Dean and his wife.

As a manager, Lee was responsible for supervising several first-level managers, including Henry Bittle, Mary Stewart, Jonelle Yunk, and Kim Clift. The first-level managers under Lee rotated between shifts and work groups, so that there was a change in first-level managers approximately three to four times per year.

Jania Kistler has been a Personnel Representative supporting Material since August 1994. As a personnel representative, Kistler works with managers in Material regarding various personnel issues as well as answering questions for employees or referring employees to the appropriate Boeing organization.

On June 4, 1998, a race discrimination class action suit, *Williams et al. v. The Boeing Company,* Case No. C–98–761–C, was filed in the United States District

---

1. The following findings are based upon the contentions of uncontroverted fact and evidence submitted by the parties. Factual claims based on inadmissible and unautheticated evidence are excluded from these findings.

Court for the Western District of Washington. Mary Dean was the only plaintiff from Wichita, Kansas.

On November 4, 1998, a First Amended Complaint was filed in the *Williams* class action in Seattle. In this Amended Complaint, there were six additional named plaintiffs from Wichita. Jimmie Dean was not one of the additional plaintiffs.

On January 22, 1999, Boeing and the *Williams* plaintiffs announced that they had reached a settlement. The same day, the court provisionally approved a Consent Decree settling the case, along with setting deadlines for members of the class to object.

The settlement received coverage in the Wichita newspaper, as well as in various television and radio outlets. None of the individuals accused of wrongful retaliation in this case—Lee, Millie Stewart, Henry Bittle, and Jania Kistler—were involved in the negotiation of the *Williams* settlement.

Boeing paid for Mary Dean to travel to Seattle for the settlement announcement. Mary Dean asked that her husband accompany her. During this trip, Phil Condit, Chairman of the Boeing Board of Directors, also met with the Deans at Mary Dean's request because she had concerns that there would be retaliation arising out of the settlement. Mary Dean expressed her concerns to Condit about the treatment of black workers at Boeing Wichita. Condit told her that Boeing would not tolerate any retaliation.

After the settlement was announced, a group of class members filed an objection to the proposed Consent Decree on April 23, 1999. The group, known as the McClam–Brown objectors, included several of the named plaintiffs in Wichita. The Deans were not a part of this group, and continued to support the settlement.

On July 16, 1999, counsel for the McClam–Brown objectors deposed Mary Dean. Dean supported the Consent Decree as proposed by Boeing, and received time off with pay to give her deposition.

On September 30, 1999, the District Court approved the Consent Decree. Mary Dean was scheduled to receive $50,000 under the Consent Decree, Jimmie Dean $15,500, and Mary Dean's son (Cordell Bolder) $13,000. The Consent Decree contains a provision prohibiting retaliation against anyone who "received a monetary award pursuant to this Decree." The Decree states:

> Except as otherwise expressly stated herein, the sole method of asserting rights under Section X of the Decree shall be by submitting a claim under Boeing's Alternative Dispute Resolution ("ADR") program for resolving employment disputes, including the arbitration provisions thereof.... If an employee elects to assert retaliation claims with the Equal Employment Opportunity Commission and/or with a state fair employment practices agency, then after the agency has terminated its processing of the charge, the employee shall pursue any relief exclusively under the Boeing ADR program, or will be deemed to have waived his or her rights to assert such action as a violation of this Section of the Decree, and instead to have elected to proceed solely under the applicable fair employment practices statute(s).

Decree, § X(A)(3), at 16.

On October 29, 1999, the McClam–Brown objectors filed a Notice of Appeal to the United States Court of Appeals for the Ninth Circuit from the order approving the Consent Decree. That appeal is still pending.

Boeing's rules, published on the back of every Boeing telephone book, require all employees to treat others with respect, dignity, and trust. Conduct that is sexually harassing or otherwise threatening or

intimidating, or conduct that violates Boeing's rules or EEO policies subjects an employee to corrective action.

On August 18, 1998, a letter that was co-signed by each of Boeing Wichita's Vice-President/General Managers was sent to all Wichita employees. This "Employee Briefing" focused on Boeing's commitment to maintaining a harassment-free work environment.

The Employee Briefing instructed employees to bring any offensive conduct to the attention of their manager, but also indicated that employees could report offensive activity to their Personnel Representative or Boeing's Equal Opportunity/Workplace Diversity offices. The Employee Briefing also put all employees on notice that a suspension would normally be the first step in the disciplinary process for harassing conduct.

Employees were also made aware and reminded of Boeing's Company Rules, specifically including the prohibition on harassing conduct, during the crew meetings with their first- or second-level managers, or both.

From the time he began working at Boeing, Dean was aware of Boeing's policy prohibiting harassment and aware that employees who felt victimized by harassing conduct could report the harassment.

On several occasions, Stacey Anderson informed Boeing that she had told Dean to "stop bothering her" several times. On numerous occasions, Anderson's lead, John Thompson, told Dean to stop making comments to Anderson.

Kim Clift was Anderson's first-level manager from September, 1997 to February, 1998. Anderson told Boeing that she had complained to Clift about certain sexual remarks Dean had made to her, which she considered inappropriate.. Dean left Anderson alone for about a week after she spoke to Clift, and then he started again.

In September of 1998, Anderson complained about Dean's conduct to Millie Stewart, who was then her first-level manager. Anderson told Stewart that she did not want to file a written complaint, but she just wanted Dean to stop bothering her.

Millie Stewart documented the complaint from Anderson, and turned the matter over to her second-level manager, Lee. Stewart also covered the Boeing Rules of Conduct once again in her crew meeting, with Dean in attendance.

On January 22, 1999, the first-level managers in Material had a crew meeting where they again re-emphasized Boeing's Rules of Conduct and the fact that employees should not be "name calling," but should be using proper names.

After this meeting, Anderson complained to her first-level supervisor, Henry Bittle, about language being used by Dean. Bittle took notes of this conversation and passed them on to his second-level manager, Lee. Lee then passed them on to the personnel representative Jania Kistler. Anderson in part was motivated to bring this complaint because she did not want to have to work with Mary Dean.

Kistler met with Anderson on January 27, 1999. Anderson told Kistler that she did not want to file a formal complaint, and did not want to be known as a "tattle teller." She was afraid that Dean and his wife would harass her if she filed a complaint. Anderson had five witnesses who could corroborate all or part of her complaints against Dean. However, in her meeting with Kistler she did not identify these corroborating witnesses because she did not know whether these witnesses wanted to come forward.

On January 27, 1999, Bittle and Kistler met with Dean to go over the rules regarding inappropriate remarks that were cov-

ered at the crew meeting on January 22, 1999, when Dean was absent. Dean understood that the name-calling issue was addressed at the crew meeting because of complaints against several employees, not just against himself. During this meeting, Dean expressed concern that the meeting was disciplinary in nature. Bittle and Kistler assured him that this was not a verbal warning, but he should be careful about what he said. Kistler and Bittle did not tell Dean that it was Anderson who had complained.

Because Mary Dean also missed the crew meeting on January 22, 1999, her first-level manager met with her and the other employees absent from the January 22, 1999 crew meeting to go over the Boeing Rules of Conduct.

As discussed earlier, Mary Dean was transferred at her own request to second shift on January 25, 1999. This transfer brought Anderson and Mary Dean together in the same shift.

Shortly after meeting with Kistler and Bittle, Dean discovered that it was Anderson (and Anderson's boyfriend, Sean McGinnis) who had complained about him. Mary Dean made an appointment for Dean to see Kerry Crip, Director of Human Resources. After this meeting, Dean was upset and could not understand why McGinnis and Anderson were lying. After she learned that Anderson had made the complaint, Mary Dean told Bittle that "Jimmie was not going to let it alone." She also told him that there was no way that Dean would say that a white woman looked good or make any inappropriate remarks to a white woman. She told Bittle that the complaint "was a lie." (Mary Dean dep. at 96–97).

Mary Dean also told numerous other employees at Boeing that Dean would never make inappropriate comments to a white woman. Mary Dean has testified that she was so upset and angry about the allegations that she told anybody and everybody who would listen that her husband would never make these comments to a white woman.

Several employees, including Stacey Anderson, became aware that Mary Dean was calling Anderson a liar. On January 29, 1999, Anderson complained to first-level supervisor Bittle about Mary Dean making a comment about "a white woman."

Bittle moved Anderson out of the Extrusion area after Anderson had complained about Mary Dean pretending to call Jeff Turner, Vice President/General Manager Boeing Wichita about the alleged lying.

On February 11, 1999 Anderson again complained to Bittle about Dean's conduct, and also complained that Mary Dean had been harassing her. Anderson was upset because she found out that Mary Dean was scheduled to move to second shift temporarily. Anderson told Bittle that she had witnesses regarding her complaint against Dean, and she would go to the EEO if Mary Dean came over to second shift.

On February 12, employees Patrice Bartleson and Gayle Weller provided statements to Bittle, complaining about Dean's treatment of Anderson. The employees also alleged that Mary Dean was receiving preferential treatment by being able to transfer to second shift. Bittle forwarded these statements to Kistler.

Kistler met with Anderson on February 16. She told Anderson she would be turning the matter over to the EEO and they would need to get a full statement. Anderson wanted the complaint referred to the EEO, and she did not object to the plan. She asked Kistler if she could move to first shift to reduce the stress. The request was granted, and Anderson moved to first shift the following day. The same day, there were discussions about whether

or not Anderson was going to file a complaint against Mary Dean for calling her a "peckerwood." Mary Dean wanted to confront Anderson "to get her straight" that she did not say that Dean would not mess with a peckerwood. When Dean did not get a satisfactory response from Bittle, she called Lee at home and attempted to contact the second shift personnel representative. Lee told Mary Dean that if these incidents continued, he would need to assign either Dean or her to another manager pursuant to company policy.

On February 22, Mary Dean was moved back to first shift, where there were more supervisors to cover any disputes that occurred. At the same time, Anderson was moved to the paint stores area, which was in a separate building where Mary Dean worked.

Mary Dean attempted to contact Jeff Turner, Vice President/General Manager Boeing Wichita with the allegation that Anderson was making a false complaint against her. She also went to Vernell Jackson, Director of Material, to complain about Anderson. During this conversation, Mary Dean referred to Anderson as "a two-bit whore." (Mary Dean dep. at 109–10).

On February 22, 1999, Anderson filed a complaint with Boeing's EEO alleging that she was sexually harassed by Dean. Boeing EEO Investigators Steve Trainer and Donnis McPhaul interviewed Anderson. She told them that Dean made repeated inappropriate comments, beginning in September 1997 and continuing through January 1999. These comments included, among other things, "If you were my wife, I would eat you for breakfast," and "I want to be your big daddy." According to Anderson, the latter statement would be accompanied by "a little dance where he rolled his hand ... down by his crotch" (Anderson dep. at 100–01). Anderson also said that Dean would ask her how she was

and when she replied "fine," he responded "I know you are fine, but I want to know how you are."

Around March 12, 1999, Boeing retained Jeffrey Emerson of the law firm of Foulston, Conlee, Schmidt, and Emerson, LLP to investigate Anderson's allegations against Dean, and Dean's allegations that witnesses were lying about him. Boeing had used the Foulston firm to investigate sixteen complaints during this general time period. Boeing decided to use Foulston for two reasons. First, its EEO department was backlogged. Second, it wanted an outside investigator because Dean and his wife were scheduled to receive funds in the *Williams* settlement. Except for the initial taking of the statements of Anderson and Dean by Trainer and McPhaul, Boeing did not participate in the investigation of the complaints.

Emerson interviewed 20 employees, including 10 of Anderson's and Dean's co-workers, four managers in that area, and four workers from Boeing's EEO office. Emerson decided not to interview McGinnis or Mary Dean because of the strong potential for bias in their answers. Emerson also reviewed numerous documents, including the separate files maintained by the supervisor and the personnel representative relating to Anderson and Dean. He tape recorded his interview with Dean, and a transcription was made.

During this interview, Dean admitted saying the words to the "Big Daddy" song on one occasion. He also admitted that he may have said, "I know you are fine, but I want to know how you are" to Anderson. He also admitted that John Thompson told him on one occasion to leave Anderson alone.

On April 13, 1999, Emerson delivered are port on his investigation of Anderson's complaints against Robert Goudy, the Chief Counsel for Boeing Wichita. In his

report, Emerson provided synopses of his interviews with each witness and wrote that the case "turns on the credibility of witnesses." He concluded that "My overall impression is that Anderson is telling the truth in claiming that Dean sexually harassed her from October, 1997, to January, 1999." He based his conclusion on Anderson's prior complaints to her lead and managers, as well as corroborating witness statements.

In demonstrated cases of sexual harassment, Boeing convenes a disciplinary meeting to determine whether discipline is necessary, and, if so, the extent of the discipline. Although the attendees vary, the meetings are generally attended by Richard Rader (Boeing's Disciplinary Coordinator) and a representative of Boeing's EEO office. One of Rader's responsibilities is to monitor employee discipline to ensure it is applied consistently. Based on his knowledge of past events, Rader provides a recommendation as to whether discipline should be applied, and, if so, how much.

According to Rader, in cases involving inappropriate language or conduct (but not involving physical contact) the presumptive discipline is a suspension. When that conduct has taken place over a long period of time, or is severe in nature, Boeing has determined that a three-day suspension without pay is appropriate.

It is uncontroverted that, between January 1, 1998 and May 14, 1999, 11 employees, not including Dean, received three-day suspensions for conduct similar to Dean's. Except for one external charge of discrimination that was filed earlier by one of the employees, none of those employees had ever filed an internal or external charge of discrimination or initiated a lawsuit against Boeing.

After receiving Emerson's report, Boeing convened a discipline meeting. Rader, Goudy, Lee, Kistler, and at least one member of the Boeing EEO office attended the meeting. Each person at the meeting was given a copy of the Emerson report. Based on Emerson's determination that Dean had sexually harassed Anderson over a 14-month period, Rader recommended that Dean be suspended for three days. Rader's recommendation was based solely on Emerson's report and was not influenced by Boeing management. The other attendees agreed with Rader. The panel also decided that Jack Thompson had used inappropriate language in the workplace, and that he should receive a Corrective Action Memo (CAM) and be suspended two days without pay.

On May 14, 1999, Dean received a CAM and a three-day suspension without pay. Dean had not previously been subjected to any discipline by Boeing. The same day, Thompson received a CAM and a two-day suspension.

On January 17, 2000 and again on May 8, 2000, Dean sent letters to Stanton Hazlett, the Kansas Bar Disciplinary Administrator, alleging that Emerson had engaged in unethical conduct during his investigation. Specifically, he alleged that Emerson lied in his report concerning statements Dean had made in his interview with Emerson. Hazlett responded to Dean on May 9, 2000, stating that he found no basis for Dean's allegations, and did not intend to further investigate them.

On May 20, 1999, Dean filed a grievance with the Union, alleging that the discipline imposed was unjust. The Union was prepared to take the grievance to arbitration. On August 27, 2000, however, Dean informed the Union District Business Representative that he had already filed a lawsuit in federal court, and told the representative that "You or no one else will deliberately mess up my case in federal court with your arbitration."

On August 29, 1999, Dean filed a charge of discrimination with the EEOC regarding the three-day suspension. On January 11, 2000, Dean received a letter from the EEOC stating that it had investigated his allegations, and had determined it was unable to conclude a violation had occurred. The EEOC offered Dean the opportunity to submit additional evidence. After receiving additional evidence from Dean, the EEOC notified Dean on March 27, 2000 that it was going to dismiss his charge of discrimination and issue a notice of right to sue because it could not substantiate his allegations.

Dean contends that Boeing management, in particular Bittle, Lee, Kistler, and Millie Stewart, encouraged Anderson to bring false allegations of sexual harassment against him. He alleges that Bittle, Lee, Kistler, and Stewart knew the allegations were false.

Dean surmises that Bittle must have encouraged Anderson to file her complaint because he observed them talking prior to Anderson's filing of the complaint. He saw these conversations from about 100 feet; he did not hear what was said. He alleges Bittle knew Anderson's allegations were false, because he knew that Anderson was acting because of Mary Dean. His speculation is based on Anderson's statement to Bittle on February 11, 1999. Emerson was aware of Anderson's motivations, and considered this in reaching his ultimate determination that Anderson's complaint was credible.

Dean has testified that he never had any problems with Lee before February, 1999. To the contrary, Dean claims that Lee called his home on February 23, 1999 to warn him that Lee had overheard a conversation between Anderson and Tamara Buchanan where they discussed making a false allegation against Dean. Dean also admitted Lee had warned him that another employee had complained about Dean

sleeping on the job. Dean is unaware why Lee's attitude changed after February 1999 from helping him to allegedly lying to Emerson about him. Dean testified that Lee never discussed the *Williams* lawsuit with him. When a co-worker told Dean, "You can buy a Cadillac now, Jim," Lee required the employee to apologize.

Dean's first-level supervisor, Bittle, made a copy of the Consent Decree for Dean. In March of 1999, other employees became aware of the money being distributed in *Williams*.

Mary Dean asserts that between the filing of the *Williams* lawsuit and the January 1999 settlement announcement, Lee told her on a daily basis he didn't understand why people would sue their employer and that the *Williams* plaintiffs were "spinning" their wheels because Boeing had "thousands of lawsuits" brought by plaintiffs who don't win. Mary Dean also alleges that, after the settlement announcement, Lee told her constantly the overall settlement "might be fifteen million on paper [but] that don't mean you are going to get money from Boeing." Lee also allegedly told her that he saw that the "Dean family was cleaning up" in the settlement. There were other no witnesses to any of these conversations.

Dean believes that Boeing hired an outside attorney to "stack the cards" against him and "paid that attorney to come with reasons to say that Jimmie Dean did this," because, from talking with other employees, he determined that this was the first time that Boeing hired an outside attorney to investigate a claim. However, he admitted that this was just his opinion. It is uncontroverted that Goudy stressed to Emerson the need for objectivity in his investigation.

Dean believes that nine of the individuals interviewed by Emerson provided false testimony: Anderson, Patricia Weller,

Zack Walton, Larry Jones, John Thompson, Patrice Bartleson, Millie Stewart, Kim Clift, and Lee. Dean has no information that Emerson knew that any of the witnesses were lying.

Dean believes that Boeing withheld several documents from Emerson. Specifically, he alleges Emerson did not review some handwritten notes from Bittle, handwritten notes and an e-mail from Stewart, and notes from Kistler (Deposition Exhibits 6, 8, 47, 48, 49, and 50). Contrary to Dean's supposition, Emerson has testified that he considered each of these documents in evaluating the credibility of each witness.

Dean also cites the report of Rita Rogers, a business agent for the Union, made after the suspension. The report contains the statements of witnesses that Dean asked the Union to interview. Rogers did not interview Anderson or review either her EEO complaint or the Emerson report. She relied on information provided by Dean and Tamara Buchanan.

On January 6, 2000, Dean filed a complaint with the Boeing EEO alleging that black co-worker, John Thompson, had made seven racially inappropriate comments to him between December 21, 1999 and January 5, 2000. Dean's statement was taken to EEO investigator, Steve Trainer. Dean later provided the names of four witnesses to Trainer.

Trainer interviewed those four witnesses, and three additional witnesses. During the investigation, two of the witnesses came forward and told Trainer that Dean had attempted to speak with them about their testimony. Trainer conducted follow-up interviews with these two witnesses about Dean's contact with them.

Because of Dean's contact with the two witnesses and the conflicting information received during the investigation, Trainer checked with Boeing Legal about how to proceed. Because of Dean's efforts to influence two of the witnesses, Boeing EEO was unable to draw any factual conclusions and the investigation was closed. Lee was not involved in any manner in the formulation of the investigative findings.

Trainer met individually with Dean and Thompson to notify them of the results. He also reminded Thompson of the rules prohibiting harassment.

Dean had one meeting with Lee regarding the remarks made by John Thompson. During that meeting, Lee offered to move Dean to another area but Dean declined.

After filing the complaint against Thompson, Dean testified Thompson did not make any other inappropriate comments to him and he never complained to any Boeing manager about Thompson.

Dean is alleging that Trainer and Lee retaliated against him by not taking action on his EEO complaint against John Thompson. Dean's only evidence of retaliation is Boeing's alleged failure to pursue his complaint and do anything about Thompson's conduct. Dean has no information that Lee was involved in the EEO investigation. He also has no evidence that Boeing failed to investigate the complaints relating to Thompson in retaliation for his involvement in *Williams*. Dean is not alleging that Thompson's comments were retaliatory for the *Williams* lawsuit.

**Steward Status**

Dean was elected a union steward in October 1997. Dean was one of six union stewards in the area managed by Lee. There were three stewards on first shift and three stewards on second shift.

In late 1999, Lee began exploring various cost-cutting measures in light of recent process automation and the substantial layoffs that had occurred in his area. At the time, Lee had six shops under him with approximately 92 employees, which was a reduction from 116 employees due to

layoffs. Lee recommended to Vernell Jackson that the six shops be combined into one shop to reduce administrative costs and gain other business benefits. In January of 2000, Jackson approved a reorganization of the shops under Lee. The reorganization became effective on January 11, 2000.

Lee explained the reorganization to employees under his supervision in cross-talk meetings and crew meetings. .

Because Boeing was laying off workers, some employees had questioned whether there were too many union stewards because each steward had super-seniority, which protected them from layoffs. For example, there were only 15 workers on second shift but there were three stewards. These questions were raised in 1999 and 2000, and the Boeing Labor Relations Department received notice of the employee questions from Lee.

Section 4.7 of the Collective Bargaining Agreement sets forth the rules regarding Union stewards, and provides: "The Union may designate one (1) employee as a steward for each one hundred (100) employees, or fraction thereof, for each shift in each shop." It also provides that Boeing would notify the Union of cases involving the selective reduction of stewards. In that event, the Union would notify Boeing of the names of the individuals to be deleted from steward status. Under the rules of the Union, the least senior steward is decertified when a reduction in the number of stewards is required.

Because the number of employees and shops had been decreased, Labor Relations requested that the Union review the number of union stewards in Material to determine if a reduction was necessary. At the same time, Labor Relations asked the Union to review the number of stewards. The Union and Labor Relations then had discussion about the application of Rule 4.7 of the CBA.

At this time, the Union and Boeing knew that Dean and other stewards in Material were opposed to any decertification. One of the Union's representatives spoke with Jackson and Lee regarding the business reasons for the reorganization.

In May of 2000, the Union determined that the number of union stewards in Material should be reduced from six to two (one for first shift and one for second). Based on union rules, the four stewards with the least seniority were decertified on May 11, 2000. One of those four was Dean. None of the other three former stewards were a part of the *Williams* litigation, or had filed any claim against Boeing.

During this time, Boeing Labor Relations also received inquiries from other work areas outside of Material regarding whether a reduction of union stewards was warranted due to layoffs or reorganization. Boeing Labor Relations also discussed these areas with the Union, some of which resulted in additional decertification.

On June 29, 2000, a grievance was filed with the Union by Dean and other former stewards. When the two remaining stewards in Material resigned, the Union held an election for the position. Dean ran for the second position and lost. Boeing had no involvement in the elections.

The Union assigned Special Representative Ron Eldridge to investigate Dean's grievance. Eldridge decided that the decertification was in accordance with the CBA and had been consistently applied. George Hooper, General Vice President of the Union, told Dean of the Union's decision.

On November 3, 2000, Dean filed a charge of discrimination against the Union, alleging that it retaliated against him in the decertification because of his involvement in *Williams* and because his wife had

accused union officials of misuse of union funds. Dean did not file an EEOC charge alleging retaliation arising out of the union steward decertification.

Dean cites comments made by Lee as evidencing an intent to single him out. But these comments only show that Lee was aware decertification would affect particular individuals, including Lee. There is no evidence that Lee was motivated by any desire to retaliate for Dean's participation in *Williams*.

In late July of 2000, Lee was told he would need to reduce his headcount by three employees (one shear operator, one saw operator and one material processor) and he shared this information with his employees. Because Dean had the least seniority among saw operators, he was told that he should be expecting a layoff notice. Two other employees were also notified that they should expect layoff notices.

Before the 60-day layoff notice (WARN notice) was issued, Lee was able to work with other groups at Boeing to place all three employees, so none of them were laid off at that time.

Dean was laterally reclassified into the job of chemical tech preparation and he was moved to another building and a different organization. Since moving, Dean has again been elected to union steward.

Dean has alleged that the only time union stewards are decertified is when a manager has a personal vendetta against them. He alleged Lee was motivated to have him decertified because he knew Lee had sexually harassed a female worker, and because he had a vendetta against Tamara Buchanan, one of the other union stewards.

Dean does not believe that Section 4.7 required a reduction of union stewards in Material. He acknowledges that the Union interpreted this section differently. Dean has also alleged that on six occasions

between December 1999 and May 2000 Lee had announced at crew and steward meetings that he had discovered a way to combine shops in order to declassify union stewards.

On July 28, 2000, Dean and his wife traveled to Chicago to meet with Rev. Jesse Jackson and several representatives from Boeing Seattle. During this meeting, Mary Dean expressed dissatisfaction with how Boeing was treating black workers. Dean also told Boeing executives that Lee had a personal vendetta against him and that because of it he was going to be laid off.

After Dean returned from Chicago, Dean was told that Boeing had found a job for him so he would not be subject to layoff. He believes that Seattle intervened to save his job, and knows that because he and his wife heard about it "through the grapevine."

**Conclusions of Law**

■ The court must grant summary judgment against plaintiff Dean's contract claim alleging violation of the Consent Decree in *Williams*. First, the Decree remains on appeal and thus by its own terms is not yet enforceable. Further, and also by its express terms, the Decree states unambiguously that claims alleging violation of the non-retaliation provisions in the Decree are subject to alternative dispute resolution. The Decree provides that a party complaining of retaliation may proceed to litigation under "the applicable fair employment practices statute(s)" and waives any claim of violation of the provisions of the Decree.

■ With respect to Dean's claim of wrongful retaliation in violation of statute, the court finds that Dean's claims encompass only the three-day suspension. The additional alleged acts of retaliation—the investigation of Dean's complaint against

John Thompson and his temporary removal from the position of shop steward—are not actionable for several reasons.

First, Dean has failed to demonstrate in either instance that he was subjected to any substantial adverse employment action. *See Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir.1998); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998). With respect to Dean's complaint against Thompson, the complaint did not receive a full investigation because of Dean's own contacts with witnesses. However, Thompson was still counseled about his conduct, and the uncontroverted evidence is that the alleged harassing conduct has not recurred. Similarly, Dean's loss of his union steward position was the voluntary act of his own union. Moreover, although Dean complains that the loss of the position carried with it a greater risk of layoff, no layoffs have occurred. Indeed, Dean has been transferred to a new area, where he has run for, and won, the position of steward.

Second, Dean has failed to provide any evidentiary basis for the concluding that wrongful retaliation lay behind either of these events. With respect to the Thompson investigation, the decision to suspend the investigation was not made by Lee, who is the particular target of Dean's speculations of a retaliatory animus. The investigation was suspended by EEO investigator Trainer. It is uncontroverted that Trainer made this decision because of Dean's contacts with witnesses to the alleged misconduct. Plaintiff has provided no basis for inferring a retaliatory motive on the part of Trainer. Similarly, Dean has failed to provide any basis for inferring that the loss of the union steward position was motivated by a retaliatory intent. The decertification happened some two years after the *Williams* action was

filed, and over a year after the settlement was announced.

Turning to Dean's claims with respect to the three-day suspension, the court must first reject Dean's suggestion that direct evidence of retaliation, in the form of various statements by Lee to Mary Dean, exists in the case. Even crediting Mary Dean's version of events, Lee's comments reflect only an initial opinion that he did not think that the Deans would succeed in their lawsuit. He apparently later changed his mind, and indicated that the Deans were doing very well in their settlement. But there is an utter absence of any direct evidence of a retaliatory intent on the part of Lee or any other manager of Boeing. Accordingly, the court must analyze Dean's claim of retaliation under the burden-shifting analysis of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Applying that analysis, the uncontroverted evidence before the court compels the conclusion that the plaintiff has failed to demonstrate that Boeing's rationale for the suspension—enforcement of its policy against sexual harassment—was a pretext for retaliation. Anderson's complaint of sexual harassment obligated Boeing to investigate her charges. The investigation was completed by an outside counsel who reviewed all of the documentary evidence, and interviewed numerous witnesses. During the investigation, Dean admitted to making some of the comments complained of by Anderson. Anderson's comments were also corroborated in whole or part by other witnesses. Counsel concluded that Anderson's complaint was credible.

The bulk of plaintiff's response is centered on the independent question of whether or not Dean was in fact guilty of sexual harassment, and thus on a self-described quest to "clear his name." How-

ever, the question before the court is not whether Dean was indeed guilty of harassment, but instead whether Boeing had a good faith belief that harassment had occurred, or whether the investigation of the harassment was so divorced from a good faith inquiry that it indicates an intent to retaliate for participation in the *Williams* litigation.

The court finds no basis for concluding that the decision to suspend Dean was a pretext for retaliation. The decision to suspend Dean was reached by Dick Rader (Boeing's Disciplinary Coordinator) and approved by the disciplinary review panel. The decision was based upon an independent investigation by attorney Emerson. It is uncontroverted that Emerson was instructed to reach a fair and objective conclusion regarding the complaints advanced by Anderson and by Dean. Emerson's uncontradicted testimony is that he attempted to do so. He made allowances for minor discrepancies in the stories of the parties, but ultimately concluded that Anderson's complaints were credible. Dean's actions, as complained of by Anderson, were in violation of company policy regarding harassment. There is no evidence that Rader, Emerson, or the individual members of the review panel harbored a retaliatory animus against Dean, or that they merely rubber stamped a decision made by a party with a wrongful motive.

IT IS ACCORDINGLY ORDERED THIS _____ day of March, 2002, that defendant Boeing's Motion for Summary Judgment (Dkt.No.74) is hereby granted.